The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. The case for argument this morning is 18-1976, GlaxoSmithKline v. Teva Pharmaceuticals. Ms. Brooks, welcome back. I was recalling this morning that we were all in the same courtroom the last time we heard this case, so we can guess about how long ago that was. In any event, please proceed. Thank you very much, Your Honor, and good morning, everyone. May it please the court. On Friday, Teva filed a notice of supplemental authority citing two additional cases. Neither of those cases are applicable here. The HZNP case is a paragraph 4 case where the patented method of use had never been approved by FDA, so it had never been on the label. Grunenthal is inapplicable because it deals with a true Section 8 carve-out. That is, the generic had carved out all the patented uses from the label, and the only uses remaining on the label were unpatented. That is not our case. Teva never did that. Well, let me ask you about – if I could just follow up on that. I'm sorry to interrupt. So your position is this case might very well be extremely different if this were a true skinny label. So what makes this case different is it's not a skinny label. It's a partial label. Correct, Your Honor. That is absolutely right. That's why we've never referred to the label as the skinny label, because it's not. It is a partial label. And just to reemphasize, so the issue and the outcome might well be different in the analysis if it were a skinny label case. Correct, Your Honor. So let me ask you then about – I'm sorry, go ahead. I was just going to try to explain to the court how we got here. So on GSK's label, there were two heart failure indications, indication 1.1 and indication 1.2. Teva, on its partial label, only carved out the first one and not the second one. Well, let me ask you about that. Just to be clear, I'm looking at JA 6881 and 6882, which is what I understand to be the declaration you submitted to the FDA in 2008 under penalty of perjury when you listed the triple O reissue in the Orange Book and delisted the 69 patent. Is that correct? That is correct, Your Honor. And if you compare that to JA 7992, which is the 2003 GSK label, that includes, at 7992, three separate indications listed. And I don't understand – and your position in the briefs was that the use code, decreasing mortality caused by congestive heart failure, meant both indications and 2 wasn't tied to any particular indication. I don't understand how that's even plausible. If you look at the bottom of 6881 – I'll give you a chance to respond. I just want to get it. If you look at 6881, Box 42A, and this is dealing with the FDA 2008 000 reissue, that box asks you to identify the use with specific reference to the approved labeling. And then you write this long sentence, which you'll see, and it seems to me that the answer in Box 4.2A, the language is extremely specific. And it differs from what you filed in 2003. So you had enough room to put the LVD stuff in that box, and you didn't. You listed one indication, but not the other two indications that you had previously listed. Why isn't that sufficient to take away that this is a Section 8 carve-out? If you had written your use code to expressly include the post-MILVD indication, I don't think we'd be here today, because Teva would have either had to bring a paragraph 4 for the full label and sorted out all the stuff pre-launch, or it could have carved out only hypertension. So now I'll let you respond. I'm sorry to interrupt. No problem. So actually, Your Honor, the indication that is listed at 6881 covers both indications 1.1 and 1.2, because it is missing critical language that appears only in indication 1.2 that would not apply to, I'm sorry, appears only in indication 1.1 that would not apply to indication 1.2. So if we look, for example, at Appendix 5532, that's Teva's full label where they put the carved-out indication back on. And you see indication 1.1, it talks about heart failure, and it talks about how carbidolol tablets are indicated for the treatment of mild to severe chronic heart failure. So let me stop right there and go back to Appendix 6881. The word chronic is missing from that. And there's a specific reason why. Because indication 1.2, the left ventricular dysfunction following myocardial infarction, is not talking about chronic heart failure, because these patients are just beginning to suffer from heart failure as a result of having had a heart attack. So that word chronic does not appear on the use code form. More importantly, if we look back... But let me ask you about that just before we lose that point. I started off with comparing this to your 2003 submission. And in that submission, where you list three separate indications, aren't the words the same? I would have to go back and look, Your Honor, but... I'll tell you where it is. Sorry. 7992. That's where you listed... In 2003, it's the label. And I think what you listed under congestive heart failure for that indication is precisely the language you listed under the 42A that we're talking about. So I'm having trouble finding that, Your Honor. This appendix is terrible, because it doesn't go in chronological order. I have a horrible time, too. Your Honor, perhaps I can clear this up by not just focusing on the word chronic. There's another phrase that is left off at 6881, which is where Your Honor referred me to look at. Okay. It ends with, to increase survival. Now, if we go back again to look at the heart failure indication 1.1, we see yet more words at the end. It says, to reduce the risk of hospitalization. That is not on this form, the use form. And again, there's a reason for that. If I could just give the Court a quick background of how we got here. GSK performed three studies to get approval for two heart failure indications. For the heart failure indication 1.1, they conducted a study called Comet and a study called Copernicus. And that was on patients who were suffering from mild to severe chronic heart failure. And it showed that it not only increased survival, which is the language you can find in the heart failure indication, but it also reduced the risk of hospitalization. Then GSK conducted a third clinical trial called Capricorn. And Capricorn was done on patients who had recently suffered a heart attack. And as a result, their left ventricle was damaged, causing heart failure. Now, those patients had been excluded from Comet and Copernicus. So now they did the Capricorn study. And what they found in the Capricorn study, that using carbidolol to treat these heart failure patients did reduce the risk of mortality from cardiovascular failure. But it did not reduce the risk of hospitalization. So if we look at the use code, that language is left off. Because if it had been put on, then it wouldn't have applied to the Capricorn study. And it wouldn't have applied to the 1.2 indication. So these studies were done before 2003, I assume. Yes, Your Honor, if we could turn so that we can get from the record, because remember the question we're trying to answer here is, did the jury have substantial evidence to support its verdict? And I certainly, you know, it's not like Kevin didn't show up. They put on some rebuttal evidence. But the question is, what was the substantial evidence the jury heard? So if we could turn, Your Honor, to the very first witness at the trial. That was Dr. Mary Ann Lucas, who testified about how these trials were conducted. And so if we look at Appendix 10381, that is Dr. Lucas' testimony, the first witness the jury heard. And we look at line 22. She's asked the question, now we see a trial called Capricorn from 1997 to 2002. What was the Capricorn trial? Her answer, so I guess I should, I should have said this before, but probably, not probably clearly enough. That heart failure is a continuing. Something happens that damages the heart. It doesn't necessarily happen suddenly. You don't start with severe heart failure typically. And patients start mild symptoms, then go to moderate, then go to severe. So the Copernicus trial we talked about was to do further, more severe. And the Capricorn trial was intended to further study the earlier end. So these were patients whose heart failure was at the time or shortly after they actually had a heart attack, an MI, and had damage left ventricle. And then, most importantly, she is shown Indication 1.2, the one that TEVA left on their label at all times. And she's asked, what is this? And she says, so this is the indication section of the prescribing information that now specifically talks about the results of the Capricorn trial. So it's to reduce, again, cardiovascular mortality, which is what the claim requires. Describes the patients. They had an MI. They had a low ejection fraction, which, again, is what the claim requires. And they either did or didn't have symptoms. And I would take the court back very quickly to the court's construction in the claim term itself of congestive heart failure. And it's found in Appendix 6.3. I'm not quite sure what that meant. No, I'm sorry. That was my other phone ringing. Oh, okay. I wasn't sure if that meant my time was up. I'd yell at myself if we were on the bench. So, Your Honor, it says it's the court's construction of congestive heart failure using Claim 1. And it says the condition that occurs as a result of impaired pumping capability of the heart, which we see is 1.2. The heart has been impaired as a result of a heart attack and it's associated with abnormal retention of water and sodium. This was best explained, again, what did the jury hear? The jury heard from TAVA's expert, Dr. Zussman, at Appendix 1132, lines 10 through 16. He's talking about the court's construction. He says, here we depict the type of heart failure defined by the court. This is with an impaired pumping function less than 40%. The need for the patient is construed by the court to have congestive heart failure. Now we go back to Indication 1.2 and those words are literally in that indication. It says for patients who have an ejection fraction of less than or equal to 40%. So we have every limitation of the asserted claim can be found in the indication that TAVA left on its label at all times. And I could walk the court through, if we had more time, where all the other limitations can be found. Well, can I, let me just, I'm certainly going to obviously ask my colleagues if they have any information because we've kind of monopolized this portion of the argument. But let me ask you one more completely other question, which was just coming out of our first argument and I know there was some discussion in that argument and clarification on the 2000 press release. I think Judge Moore had asked about it and you showed us or you turned us to where in the record it was clear that that was printed off of the computer on 2015. Do you recall that? It was on the computer. I'm just wondering, I scoured the record and so maybe you can point me to anything in the record with regard to the 2004 press release. Any evidence to show that that was remained on TAVA's computer during the time of the 000 patent? And I couldn't find anything in the record about that having remained on the computer. No, Your Honor, we don't have the record evidence that the 2004 press release was still on other than obviously we showed it to the jury and we sure didn't get it in 2004. But there's no exhibit like the one from 2007 press release that has a footer that shows it was on there as late as 2015. So, Your Honor, we're as late as... Go ahead, Judge Moore. Can I ask a couple of questions? This is Judge Moore. My first question is you had a witness that you cross-examined Woodford, who was the Director of Marketing. And is it correct that Dr. Woodford testified that TAVA put all of its carvital information on the website, the fact that it was AV-rated, the fact that it was equivalent to Coreg and all of that, that they put... She didn't specifically mention the press release, but didn't she answer your questions and indicate that they put all of their information on the website? Correct, Your Honor. Okay, so now... I'm sorry, please, let's finish. I was just going to say as a result of that, that's how we were able to access it for the trial that occurred in 2015, is we went on TAVA's website and downloaded it and turned them into exhibits. Obviously, we didn't know back in 2004 that we were going to need to keep that press release, so we obviously accessed it in real time in 2015. And in fact, counsel, again, relevant to the 2004 website, the jury was presented with the press release from 2004, a press release from 2007, evidence that the 2007 press release remained on the website in 2015, and TAVA never refuted in front of the jury that either the 2004 or 2007 press releases remained on their website at any point. Would it be fair under a substantial evidence standard for the jury to infer that TAVA put its press releases on the website and remained there? Absolutely, Your Honor. And I think that's exactly what the jury did. I'm sorry, Your Honor. I didn't mean to interrupt. I know I want to back you up for a second. In the very beginning, the Chief Judge asked you a couple of very quick questions and you answered very quickly, and then she quickly moved on, and I just want to make sure I understand your answers to those questions. In the very beginning, she asked, would this be a different case with a different outcome if you still did not have an infringing indication on the TAVA partial label? And I understood you to say yes, and I guess I want to give you a chance to think about that question for a minute and make sure that that really was the answer you meant to give the Chief Judge because I didn't find that answer to be completely consistent with your briefs. I understood your briefs to argue that the combination of product material, press releases, and everything else could amount to support for a conclusion of induced infringement even of the partial label and I guess I didn't understand your answer to hinge exclusively on us concluding that the MILVD indication amounted to infringement. Did it? Do you believe there is sufficient evidence for a jury to find inducement even if we conclude that the MI, like the District Court did in his footnote, that the MILVD indication does not amount to an infringement? No, Your Honor, and I perhaps misunderstood the Chief Judge's question. I thought the question was if the post-MILVD indication did not meet all of the limitations of the asserted claim, would this be a true skinny label case? And the answer is yes, and not that it would necessarily turn out differently because, in fact, if Teva, let's say Teva had carved even that out and had just left on hypertension on the label but had gone around to physicians as it did and said, we have a generic version of GSK's cardiovascular drug Coreg, and by the way, this is how carved bill law has been used in the past. It's been used to treat congestive heart failure in this fashion, and the only thing they had on their label was hypertension. That's still inducement, absolutely, and I'm sorry if I misspoke or I misunderstood the Chief Judge's question, but what I was trying to point out is that we have all of that evidence, which is more than substantial. When I say that evidence, I mean the press releases, what was on the website, the AB rating, not in and of itself, but it's part of the evidence. That's one bucket, but another bucket is the partial label itself, which I'm afraid has gotten lost because the amici, they all seem to be concerned that this is a true skinny label case and that the sky is going to fall because of the carve-outs because of it, and it's not a true skinny label case. At all times, this is AstraZeneca, where the court found that this wasn't a full carve-out, and because of that, AstraZeneca was correct that there was going to be infringement in that case based on the label alone because there hadn't yet been a launch, and that was 10 years ago, and nothing bad happened. We still have that unique carve-out. I don't know what to do with this AB rating evidence. The fact that Carviderol and the generic equivalent, or the Teva generic, is AB rated to Coray. Why isn't it fair for them to, why should a statement like that ever amount to induced infringement when that's in fact the way that it is referred to by the FDA and when I understand that means as labeled? So certainly, I mean, assuming this was a true skinny label case and there was an effective carve-out, when they're holding themselves out as AB rated at that point in time, if this were a true skinny label case, would you agree that can't amount to induced infringement, just a true skinny label and a claim that they're AB rated given my understanding that AB rating means equivalent as labeled? I would agree with that. Here's what I would agree with, Your Honor, that the jury was instructed that that isn't enough. So if this was a true skinny label and all Teva said is we're AB rated, the jury was instructed that's not enough. But we need to come back to what the question is here. Was there substantial evidence to support the jury's verdict? And the answer is yes. One component was the AB rating, but the other was the press releases and if I could just go back for a moment to the label, it's very telling here. We keep asking, was the jury's verdict supported by substantial evidence? So if we could look at the verdict itself, it's in Appendix 205 and there were seven claims that were asserted. In the partial label period, the jury only found three of those seven claims to be infringed. During the full label period, there were all seven of the claims to be infringed. Now the difference in proof between the partial label period and the full label period, the only difference was the content of the labels. And if we look, the claims the jury found were not infringed during the partial label period contained limitations that could not be found on the partial label itself. Whereas the three claims and the limitations of those three claims could be found on the partial label. And GSK's expert walked the jury through that exercise at Appendix 10.622 through Appendix 10.631. And so, was there substantial evidence to support the jury's verdict during the partial label that claims 1, 2, and 3 were infringed? Absolutely. We can just look at the label itself. But we did, in fact, introduce additional evidence of Tevas inducement. And so we have, I don't know if there's such a thing as more than substantial evidence, but there's certainly more than substantial evidence to support the jury's verdict. All right. I think that time has expired. We will, of course, restore some rebuttal time to you, Ms. Brooks. And let's hear from Mr. Jay. Thank you, Rutter. May it please the Court. As this Court said in Takeda, Hatch-Waxman was designed to enable the sale of drugs for non-patented uses. And the carve-out provision of Hatch-Waxman was designed for just this situation where the drug is not patented and the vast majority of uses, more than 80 percent, are not patented. Let me interrupt you there because, this is Judge Newman, because the policy aspects, the interpretation of Hatch-Waxman and the purpose of the Section 8 carve-out really, I think, have to underlie how these various facts are interpreted. And undoubtedly, Hatch-Waxman had a complex of interests that needed to be balanced. But when I interrupted you, you were saying that it was designed to allow the sale of drugs for non-patented uses. And what has concerned at least some of the amici in the briefs, in fact concerned all of them with opposing viewpoints, was how do we get there? And one of the things, one of the concerns that's been raised has been to be sure that we don't cut off at the pass the kinds of research that would develop a new use of an old drug. The Copernicus study and the studies that were done after the initial impact on the heart were discovered. If it were known that there could be no protection, I'll call it at least, through the patent system for whatever additional discoveries were made, would that work be done at all? I figure we start from the assumption that it's here, so let's not put any burdens on the use. But Hatch-Waxman was very much concerned with the threshold of doing the research in the first place. You remember Hatch-Waxman started out with the patent term extension premise because the absence of adequate term was discouraging research in some areas. So I think it would be very helpful to me if you would help focus on the public interest that's involved as well as the private interest of the generic producer. Absolutely, Your Honor. And your question is exactly right that Hatch-Waxman strikes a balance. It strikes a balance between the interest of the patent owner and the interest of the public in getting access to the unpatented molecule for the unpatented uses. And the way it strikes that balance I think is reflected in this court's case law about induced infringement in the carve-out context. No, I was concerned about not access to an unpatented use that's been discovered and approved by the FDA, but access to the research that might lead to such discovery. And Capricorn studies, whether they would have been conducted at all if it were known that the position that the generics are now taken, that it can't be protected, whether that work in the enormous investment that we're told is involved in going through phase three. Well, if I may, Judge Newman, the studies were conducted at a time when the skinny label and carve-out portions of the statute worked exactly as they work today. And the reason that an innovator can get a patent on a new method for using an old drug, they are able to enforce that if they are able to show that the generic encourages, promotes, or recommends that patented use. That's the protection that the new method patent gains. But what my friend on the other side has not given the court this morning is anything in TEVA's skinny label that encourages, promotes, or recommends every step of the method patent. And that is why this is a true skinny label case. That is why... Well, Mr. Jay, in your answer, can you include a response to what Ms. Brooks told us this morning about GSK's patent declaration at JA-6881 and the discussion we had there? Absolutely, Your Honor. And I think that the best place to see the comparison is between 6881 and the red line on 6913 of the appendix, which is the red line prepared by FDA based on what GSK had told it were the patent-protected aspects of its labeling. And this is what FDA communicated to TEVA to carve-out. And you'll see that that whole indication, 1.1, is struck through, including the risk of hospitalization, to reduce the risk of hospitalization language that my friend on the other side referred to. And as for the chronic, that was not in the label at that time. So you'll see that TEVA's... This red line reflects what TEVA carved out in its partial label. And the entire majority of what GSK said were the protected aspects of its labeling are carved out from 1.1 and more. Other references to treating congestive heart failure are stricken out throughout the skinny label. So what they're left with is, and I might as well just say on page 6913, is the 1.1 post-MILVD indication and the key parenthetical is with or without symptomatic heart failure. So the TEVA skinny label told doctors who were treating patients who'd had a heart attack and had left ventricular dysfunction after that heart attack that this is how to treat that disorder whether or not they have symptomatic heart failure. And what my friends on the other side have relied on is a statement that Dr. Zusman made at trial about symptomatic heart failure. They tried to get him to say that everybody with a reduced ejection fraction has symptomatic heart failure. Sorry, has congestive heart failure. But he disagreed with that. So what they've cited is an exchange on page 11226 in which the question builds in, does someone with symptomatic heart failure have congestive heart failure? And so he says yes, as construed by the court. But that is just the tautology. Someone with symptomatic heart failure. Mr. Jay, so he said on that page, a patient who has less ventricular ejection fraction of less than or equal to 40% with symptomatic heart failure, would they be diagnosed as suffering from congestive heart failure? And he says yes. So is it your view that the indication, if it's supposed, it didn't say with or without heart failure. Suppose it just said with symptomatic heart failure on the actual indication on the TEVA label. Would you agree then that there is infringement? Well, that's not the only element of the patented method, Your Honor. Would you agree that there is infringement of that element of the claim? I don't think so. But your expert said there was. No, Your Honor. Is it your testimony that a patient who has less ventricular ejection fraction of less than or equal to 40% with symptomatic heart failure, would they be diagnosed as suffering from congestive heart failure? Yes, as construed by the court. And the reason that my answer is still no, Your Honor, is the construction of congestive heart failure at page 130 of the appendix. A congestive heart failure for purposes of this patent and specifically treating congestive heart failure requires that the patient have been diagnosed with congestive heart failure. That's at page 130. It's built into the claim construction, and GSK agreed that that was built into the claim construction. So the limitation is not to treat symptoms of congestive heart failure or to treat a patient who is suffering from congestive heart failure. The limitation is to reduce a risk of mortality from congestive heart failure. And that requires that the patient have been diagnosed with congestive heart failure and that the purpose of administering carbidolol is to reduce the risk of mortality from congestive heart failure, not from a heart attack, not from hypertension, not cardiovascular mortality generally. So that's why my answer to your question is no. Of course, there are the other limitations as well. I guess, Mr. Tate, one of my problems with this argument, and I would love to hear your response to it, is that GSK methodically walked through the patent claims with regard to this indication in particular in Dr. McCullough's testimony. They walked through limitation by limitation, and he concluded unequivocally that this indication, the MILVD indication on your label, was a direction to directly infringe the patent. Now, you may disagree with that testimony. Clearly, in fact, you do. And then Dr. Zussman stood up and said something which, with all due respect, supports Dr. McCullough, but at a minimum doesn't contradict Dr. McCullough. And that's my problem, is I fail to see any contrary evidence that you presented anywhere in this trial that the MILVD indication did not amount to infringement. Well, that is two responses, Your Honor. So first, your question asked me to assume that Dr. McCullough said that this added up to inducement, which is what he said. But second, you asked for contrary evidence at page 11188. Dr. Zussman specifically said that these mentions of heart failure would not induce a doctor to perform the patented method. And let me explain that point. Dr. McCullough had said, here is where you can find this one limitation in the label. Here is where you can find this other limitation. What he used five or six times was the word mention. This limitation is mentioned in the label. Heart failure is mentioned in the label. That does not encourage, promote, or recommend the use of this, the doctors to perform the patented method. And that's particularly true because as we were just discussing a moment ago, Your Honor, the label doesn't say with heart failure. It says with or without heart failure. It's indifferent. But counsel, this is like you're testifying in court, and you're not testifying in court. Dr. McCullough, who was an expert, did testify. And look on page 10656 of his testimony. Does, so, does Teva's partial label meet for direct infringement purposes then this limitation? Right. So all three parts of the claim were met is his answer. And in your expert opinion, did Teva induce that infringement? Yes. So you're not a testifying expert. And what I can't find, so Dr. McCullough has testified that the Teva label amounted to direct infringement. You're arguing now that he did so by piecing together different parts of the label. But that goes to the weight to give his evidence. And that was for the jury to decide. That wasn't, isn't for me to decide. So how, where is your evidence that directly contradicts Dr. McCullough's testimony that the Teva label amounts to direct infringement by virtue of the MILVV indication? Well, a couple of things, Your Honor. So I gave you a citation for our evidence that directly contradicts what you've asked me to. Okay, but go ahead, give it to me again. 11, what? 11188. 11188. Oh, I apologize, Your Honor. This is, this is. Not in the appendix. Yeah, this is not in the appendix. It's trial transcript 1188 because the numbers correspond to the trial transcript. Okay, you didn't give it to us. So why don't you tell me what it says then. Right, so. So at that page, Dr. Zussman, who is our. Please don't tell him. I know who he is, just read it. Okay, no, no, I don't agree with his interpretation. Why is that? Because these mentions of heart failure, first of all, don't teach the method. They do not induce doctors to infringe the patent. And if anything, they are talking about warnings and precautions. These are things that could go wrong if you're using Corvitolol in the treatment of a patient. So these are discouraging statements rather than encouraging statements. Okay, well, so unfortunately, since I don't have that page or the pages preceding it or the pages after it, I can't read it in context. I will go back and look. I will find all of the trial transcript and I'll find whatever it is that you're now referring to for the first time in oral argument as contradictory evidence. But even if there is in fact contradictory evidence, isn't it for the jury to make the determination of whether or not the label contains an infringing directive, a direct infringement? Isn't that for the jury to determine? So, Your Honor, this court has a number of cases at summary judgment and even at motion to dismiss at which experts have come in to try to argue that a label encourages, promotes, or recommends a patented method. And this court has found beyond factual dispute that the label did not teach the steps of the patented method. So HZNP is just the most recent example of that at summary judgment where, of course, the same standard applies as at JMAL, which we have here. Yes, but it's HZNP, unless I'm misremembering the case, that was the one that said you apply, is it sunscreen? You apply the sunscreen after you wait a time. And the claim required the application of sunscreen. But the label in the HZM, whatever it was, case, actually didn't ever tell you to apply sunscreen. It just said if you ever want to apply sunscreen, wait a period of time. But the claimed method required the application of sunscreen, and the label in that case did not. Right, and the analogy here is twofold. One, the claimed method here requires that Carvitolol be administered for the purpose of reducing mortality from congestive heart failure, not for treating symptoms of congestive heart failure. That's part of the claim construction, page A138. But also on the co-administration, which is an awful lot like HZNP, there's nothing in this label that tells you to take Carvitolol with an ACE inhibitor or a diuretic. All there is is a report of a study, and in that study, some people, less than the majority, had taken diuretics, and as for ACE inhibitors, all Dr. McCullough said, again, Your Honor, was that ACE inhibitors are mentioned. That is not enough to encourage, promote, or recommend, especially if you look at what it says. The ACE inhibitors, patients were taking either an ACE inhibitor or an ARB, an angiotensin receptor blocker. And an ARB, the co-administration with an ARB does not infringe. So you just can't read the label in a way that a reasonable fact finder could credit, in a way that encourages, promotes, or recommends the co-administration step. And for the same reason I said before, it also doesn't encourage, promote, or recommend the treatment to reduce mortality, risk of mortality from congestive heart failure, as opposed to heart disease more generally. Mr. J., the actual indication on the label says, the tablets are indicated to reduce cardiovascular mortality in clinically stable patients who survive the acute phase of a myocardial infarction and have a left ventricular ejection fraction of less than or equal to 40% with or without symptomatic heart failure. So I guess I don't understand the cobbled together argument that you're making. The indication itself says the purpose of the use of this tablet is to reduce cardiovascular mortality. I mean, what am I missing? What am I missing? I guess I'm just not following your argument. What you're missing, Your Honor, is that reducing cardiovascular mortality does not infringe. It has to be to reduce mortality from congestive heart failure. Wait, but isn't congestive heart failure a cardiovascular mortality? I mean, isn't it? I don't understand. Isn't death from congestive heart failure a subset of cardiovascular mortality? Yes, it is. And as the court's cases that I referred to a moment ago, including HZNP and Grunenthal make clear, a subset is not enough. So the example we gave in our brief is- But this is a subset of actual infringement. In HZNP- No, no. A subset of the same limitation. Assuming I find that there is sufficient evidence that this indication is directly infringing, is recommending a method that would directly infringe, if that is the case, then this is a radically different scenario than these other cases you cited. Because while this indication might actually encourage the use of carvitral tablets to people who wouldn't be infringing, because it would include people without symptomatic heart failure, it would include people with symptomatic heart failure. So isn't that just a question, maybe, of damages or something else? But why does that make it such that- If I tell you, infringe with group A and infringe with group B, and it turns out group B is not infringing, you still have infringement with group A, right? No, not right, Your Honor. So let me agree with one part of your question, which is the point that their damages theory does not match up with their theory that the post-MILVD indication is what teaches the infringement. But let's bracket that for a moment. Because Grunenthal is exactly the scenario that Your Honor has posited, where it teaches you to prescribe this medicine to treat chronic pain. One kind of chronic pain is the infringing kind. Another kind of chronic pain is the non-infringing kind. And this court said, in that case, that teaching the method, or recommending the method, for the broader set, which includes some infringing and some not infringing, does not require infringement. It therefore does not encourage, promote, or recommend that step of the patent. So it's just not correct that reducing cardiovascular mortality is infringing. It has to reduce mortality from congestive heart failure that's black and white from the claim construction. And it reflects agreement by GSK that the patient must have congestive heart failure. And even treating symptoms of congestive heart failure don't infringe. Mr. Jay, I know that your time is short and probably actually over. But I want to give you a chance to respond to the discussion we had about the press releases. And in particular, was there any evidence in this record from TEVA that would refute an inference that could be reached by the jury that the press releases were on the TEVA website? So, of course, you'll allow me to begin my answer by saying it's not our burden to refute any evidence by GSK. And there's also no basis for such an inference, Your Honor. You asked my friend about, and you're colloquy with her, about questions by Attorney Woodford to Ms. Collier, who was the TEVA witness. And what she says is that there was product information, Carvitolol product information, on the TEVA website. It doesn't say anything about press releases. Yes, but counsel, the 2004 press release, the 2007 press release, the idea that Ms. Woodford testified that information regarding Carvitolol was being put on the website in 2004, and combine that with the thing that's shown to the jury that shows the TEVA website was still containing the press release as of 2015 or whatever, it's fair, isn't it, for the jury to infer that information was on the website the whole time? I don't think so, Your Honor, given Dr. McCullough's testimony. And there's another point from Dr. McCullough that's relevant to our previous colloquy that I want to get back to as well. So where Dr. McCullough said that he wasn't suggesting that the TEVA website was there, that's not relevant to whether it was there or not. Dr. McCullough saying he didn't know doesn't necessarily undermine the ability for the jury to infer that there was a website and that it contained this information. And my second point, Your Honor, well, I guess I have two. One is that the jury was never asked to draw that inference, not in closing argument, not at all. And then the second point is just that even if all of that, even if the press releases are properly probative of TEVA, this is what the jury instruction says, continuing to take an action during the life of the patent, all they say is that CARBIDOLOL, TEVA's CARBIDOLOL is the generic equivalent. No, that's not true, counsel. The 2004 press release says expressly that it should be used for heart failure. I understand, Your Honor, that's when TEVA received tentative approval. And then before it issued the next press release, the FDA had issued its press release saying that the generics labels differed from GSK's because of patent information. Dr. McCullough agreed that doctors would see that FDA press release and understand it. I want to ask you a question. Suppose that we were to decide whether TEVA was inducing infringement today of this patent, suppose it was still alive today. And suppose TEVA resurrected its 2004 press release which said use this to treat congestive heart failure. And suppose that when you went to the TEVA website today and searched for CARBIDOLOL, this was the very first thing that popped up, was TEVA's press release that said use this for congestive heart failure. Do you think the fact that the 2004 press release was prominently on the TEVA website today could be a basis for finding some sort of continuity of action that amounts to inducement to infringe under those circumstances? I know those are not the facts of this case. I just want to know if you think putting the TEVA press release on the website would amount to that sort of inducement. So what I'm having trouble with in your question, Your Honor, is the continuity of action point. There would be no requirement of continuity of action if the patent were alive today. So if I'm understanding your question right, it is... There would be a need for continuity of action counsel because one of the arguments you could make is this was a press release in 2004 prior to the patent issuing, right? And so an argument that could be made is that a press release from 2004 that was prior to the patent issuing can't amount to inducement because there wasn't actually a patent at the time we did it. I'm sorry. I just wanted to make clear why I'm asking you this point. So if TEVA had it on their website today, even though it was a press release from 2004, do you understand my point why I'm trying to ask you this question now? I do, Your Honor, and I had thought you meant if they issued the press release today. No. A press release from 2004 announcing tentative approval with different indications would not induce today, number one, because of its content, number two, because there's no evidence in this record whatsoever that doctors, although they might see press releases when they come out, there's no evidence whatsoever that doctors would go back and dig out archived press releases. And then the third point really takes me back. Mr. McClure, counsel, dig out archived press releases. You say that as though there is evidence that that is in the record. Did you present any evidence about how easy or how hard it would be to find this press release? No one presented any evidence that this press release was on any website, so there's no evidence about how difficult or how easy it would be to find it. Just in case you're curious, and I realize this is not record evidence, but I was curious, just kind of curious, since Teva never suggested this was unavailable, I checked your website, and guess what the very first thing that pops up is when I search on Google for carbidolol and Teva? This damn press release. It's number one on the Google hits, just so you know. I mean, perhaps Teva doesn't know that. Perhaps Teva doesn't take any action to control what search engines produce results or not, but when you said archived, it just made me think maybe I'm missing evidence in the record that suggests this press release wasn't readily available. Well, of course, today we are five years after the patent expiring, and we've had a whole trial and a whole argument about this press release. And what more does Interchambers than evidence to begin with, and I would never treat it as such. I'm just wondering if there is any evidence in the record because you said an archived press release as though that were a thing, as though there was record evidence that this press release was archived in the basement of a shoebox written in German in Teva, in a building in Teva somewhere. There is no evidence that this press release ever appeared on the website before or during the infringement period. The other point that I wanted to bring up, which is related to this, is that even with, even supposing that there are these press releases, Dr. McCullough said that there is too much information missing from the skinny label for him to prescribe Teva's Carbidolol to treat congestive heart failure. Too much information missing. Now, he said that he didn't read the label. He just assumed that the labels were the same, but that if he had read the label, he would not have allowed his patients to take it for congestive heart failure because too much information was missing from the label. That is relevant both to the colloquy that we are having right now about whether the press release would induce and also to our previous colloquy, which is whether the skinny label itself can be said to have induced doctors. Dr. McCullough, the only doctor who testified on this point, said that it wouldn't induce him because the label was missing too much information. What matters is not whether you can find a half a dozen mentions. I really want to go back to one other point that you made. You were talking to us about the FDA filings and the fact that GSK didn't include the second limitation or indication, I should say, the MILVD  things on its FDA filing that should be carved out. Did I get that right? Yes. Here is my question. What is the second limitation? Does that matter for patent infringement? I don't mean audit to matter in some policy sense. Do we want full and complete disclosure to the FDA? Of course we do. This isn't a case about whether all FDA rules and regulations were complied with. In fact, there is an FDA rule that says it is your obligation to figure out patent infringement. Let's put that aside. We are not here to debate whether an FDA rule was violated or not and what consequence that ought to have. We are here to resolve whether there is patent infringement in this case. What if any consequence to a patent infringement claim exists by virtue of GSK not having carved out the indication on that form? I want to respond to your question on the assumption you asked me to assume but I want to respond to your quote from what the FDA said about what the purposes of this declaration is. On the first point, GSK was in the best position to tell the FDA what portions of the labeling are claimed. I'm not trying to make an argument they broke FDA rules, I'm trying to make an argument about what GSK is telling not only FDA but the world. I guess the problem is, even if GSK originally said something ambiguous about MILVD and whether it infringes or not, what impact does that have on whether there actually is patent infringement? I think my answer, Your Honor, is that it highlights the cobbled together post talk nature of the skinny label inducement theory. The problem is, even if it's cobbled together, if it really does amount to infringement, it amounts to infringement. Cobbled together or not, if it creates direct infringement, it creates direct infringement. I feel like these FDA filings are a bit of a sideshow. This is Judge Proust. Does it affect intent? I think it definitely affects intent. It affects whether GSK would be equitably stopped from changing its position, and it also affects what doctors would understand as well. Ultimately, I take your point, Judge Moore, that infringement is an infringement question and not an FDA question, but in all of these allegedly incomplete skinny label cases, the question is still, as the court said in AstraZeneca, the pertinent question is whether the proposed label instructs users to perform the patented method. The court has generally looked at the indication section, not all over the court. You're certainly right that there is a quote in the Federal Register that says that use codes are not meant to substitute for the review of the patent and the approved labeling. If you read the next two sentences, what the FDA is talking about is the use code and not the part of the declaration that we've all been discussing this morning. To the contrary, the declaration, which includes the complete description of the method of use claim and the corresponding language in the labeling of the approved drug is publicly available after NDA approval. That is what both the FDA and generic do. Is there some consequence if somebody files false information to the FDA, like incomplete or inaccurate information? Sure. The submission is made under penalty of perjury, so everything from 18 USC 1001 to potential rejection of the NDA. Okay. So there are, if someone misrepresents something to the FDA, then there are consequences at the FDA level. So I agree with the absolute statement that your honor has just said that it's not absolutely dispositive of infringement, but you also would take into account how the process works in the section 8 context that this declaration is what tells FDA what to carve out and that FDA in turn tells the generics what to carve out. So if that carve out leaves behind something in the indication statement that encourages, promotes, or recommends the patented method, then I take your point that the FDA is not enforcing the patent laws, but it certainly is relevant in an infringement case where the allegation is that the skinny label is what induces, is that Teva carved out everything that GSK told the FDA and the public should be carved out to protect its patented use. Okay. Anything further from the panel? No. Thank you. Thank you. Let's restore three minutes or if you need a break. Thank you, Your Honor. Let me start with where the questioning left off about how, you know, Teva, FDA told Teva what to carve out and they did it based on what GSK said, et cetera. Here's what the jury heard. And again, the question is was there substantial evidence to support the jury's claim? And the question first, does the fact that FDA approved Teva's label in 2007 mean that Teva has been found not to infringe any of GSK's patents? Answer, no, it has no relation at all. On that same page, she was asked about the mock-up that label that FDA had sent to Teva. And she was asked, so you were asked on cross examination whether you would agree that FDA decided what came out of Teva's label. Do you remember that? Yes. And you disagreed. I did. Why did you disagree? Answer, I disagreed because it is the manufacturer ultimately that is responsible for its own package insert. And she goes on to explain why and at the end she says they are responsible for taking into account a patent. It needed to take that responsibility on itself. It's the one responsible for the label at the end of the day. So going to the next point which had come up where I think council argued that there's this diagnosis requirement that the patient has to be diagnosed with congestive heart failure. I would point the court to Teva's expert Dr. Zussman appendix 11266 cross examination. Is it your testimony that a patient who is diagnosed with symptomatic heart failure, would they be diagnosed as suffering from congestive heart failure? Answer, yes as construed by the court. That's what the jury heard. Let's go back to the indication itself. Council made it sound like this was a piece together. It doesn't matter if it's in there or not. It   together. If we look at the indication at the end, it says seek clinical support and follow the guidelines and follow   We have 4 pistol shot studies. Let's go to 14.1. Appendix 5. It's talking again about the disfunction following myocardial infarction. And the physician told us go look here. And the physician told us if we look about halfway down, background treatment included ACE inhibitors, 97% of the patients were on that. And 34% were on diuretics. That is more than sufficient to show those limitations were met. And let's finally, does this encourage a physician to use to reduce mortality caused by congestive heart failure. If we look at the results of that study, right there on 5523, the last line, nearly all deaths were cardiovascular, which were reduced by 25% by carbidolol. So clearly a physician is not going to read this and say, hey, I think I'm going to give carbidolol to a patient suffering from congestive heart failure to reduce the chance they're going to get hit by a bus. They're going to give it to them to reduce the chance they're going to die from the congestive heart failure. And we know that because if we look at the next page, appendix 5524, figure one shows the survival analysis for the Capricorn patients. Remember, these are all patients suffering from heart failure who are suffering from heart failure because their left ventricle has been damaged as a result of a heart attack. And here, right at the six-month number, which, by the way, is another limitation of the claim, right at the six-month number, the two lines begin to diverge between the carbidolol group and the placebo group. And you can see that the mortality rate for the carbidolol group is significantly lower than the mortality rate for the placebo group. And again, all of this was presented to the jury in Dr. McCullough's testimony. And with that, I would conclude my remarks for this morning. Thank you. Thank you very much. We thank both sides for this helpful argument. This concludes the proceeding for this morning. Thank you. Thank you. General support is adjourned from day to day.